IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD WARNE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. _____ |
| ) | |
| HOME OF MERCIFUL REST SOCIETY, ) | JURY TRIAL DEMANDED |
| INC., d/b/a KENTMERE NURSING ) | |
| CARE CENTER, ) | |
| ) | |
| Defendant. ) | |

## Complaint

### Parties

1. The plaintiff, Ronald Warne (hereinafter sometimes referred to as "Warne" or "Mr. Warne"), is a resident of Bear, Delaware, and was employed by the defendant for over eleven years, from November of 1994 until his employment was terminated on or about March 27, 2006.

2. The defendant, Home of Merciful Rest Society, Inc. d/b/a Kentmere Nursing Care Center (hereinafter sometimes referred to as "Kentmere" or "KNCC") is a Delaware corporation doing business as a nursing care facility located in Wilmington, Delaware.

### Jurisdiction

3. The United States District Court for the District of Delaware has jurisdiction over the parties and the claims by virtue of the pendency of a federal claim under 29 U.S.C. § 621 et seq. (the Age Discrimination in Employment Act), 42 U.S.C. § 12101 et seq. (The Americans with Disabilities Act), 42 U.S.C. § 2000e-1 et. seq. (the Title VII anti-discrimination statute), and 28

U.S.C. §§ 1331 and 1343, and under the principles of ancillary and pendent jurisdiction as well as the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

**Facts**

*Mr. Warne's Tenure at KNCC*

4. Ron Warne became employed at KNCC in 1994, serving as "Director of Maintenance and Safety Officer" until 2001, when his title was changed to "Director of Environmental Services and Safety Officer," a title he maintained until his departure in March of 2006

5. His duties in these roles included responsibility for laundry, housekeeping, floor care, maintenance, and transportation in and around the facility.

6. In addition to the above-identified responsibilities, Mr. Warne had substantial responsibility for achieving and maintaining a safe environment at KNCC, a responsibility met by a fourfold approach to safety: first and foremost, fall and injury prevention to patients; second, a generally safe physical plant; third, the development of adequate procedures for specific emergencies, such as fires or storms; and fourth, the cultivation of a safety-conscious mindset among the staff at KNCC.

7. During his years at KNCC, Mr. Warne's salary steadily increased from approximately $38,000.00 per year at the beginning to approximately $65,000.00 per year (plus bonus) at the time of his termination.

8. The consistent advance in Mr. Warne's salary was a reflection of consistently outstanding performance evaluations, including (by way of representative sample) the following statements handwritten by Eileen Mahler, KNCC's Executive Director during the last five years of Mr. Warne's employment: "Ron achieves excellence in all the areas he manages and in which he

2

participates. He is an outstanding employee in that he is detail oriented and will perform above and beyond in order to attain positive outcomes. . . . Overall, I am extremely pleased with Ron's contributions to Kentmere. I could not ask for a more dedicated, conscientious, and loyal employee" (from an evaluation dated November 1, 2001); "Ron's organizational skills, dedication and intellect is evident in all he accomplishes. He is very results oriented and continually reexamines procedures in meeting positive outcomes. This facility is so fortunate to have a highly motivated individual who always gives more than 100% of himself" (from an evaluation dated December 15, 2004).

9. Among Mr. Warne's contributions that went "above and beyond" his duties:

· he went into the facility on his off hours to train the "3 to 11" and "11 to 7" shift workers on safety issues (fire evacuation; safe use of patients lifts; fall and injury prevention);

· he was always proactive with regard to insuring that systems were functional during periods of weather change, often monitoring the facility during his off-hours to assure a smooth transition at the beginning of heating season or cooling season;

· he pitched in enthusiastically to improve holidays for residents, including: set-up, breakdown, and food-serving tasks for the annual Thanksgiving dinner; decorating and safety oversight for Christmas festivities; and participation in costumed events at Halloween;

· he spent substantial time with residents (including particularly Betty Sidwell), on occasion taking them for a walk or for ice cream; and

· for several years he distributed his Christmas bonus money among his subordinates.

10. As a result of his extraordinary contributions and dedication, Mr. Warne was awarded with a silver bowl on the tenth anniversary of his commencement date at KNCC, and in 2004 was awarded an all-expense-paid trip to "anywhere," which he used to spend four days in Williamsburg, Virginia with his wife.

11. During his years of employment at KNCC, Mr. Warne was charged with responsibility for overseeing the ongoing operation of the facility (including closely related safety issues) during several periods of substantial construction and/or renovation of the facility, and his work in this regard was recognized with several merit bonuses.

*Background on Safety at KNCC*

12. The extensive safety program requirements applicable to a facility such as KNCC are divided into seven separate domains that track the standards and regulations of the Joint Commission on the Accreditation of Health Organizations, as follows:

- fire prevention and fire code compliance (essentially relating to all elements of the facility's efforts to prevent and/or minimize the effects of fire);
- clinical and medical equipment management (including the maintenance and calibration of such things as oxygen concentrators, blood pressure equipment, weigh scales, life support equipment, electric beds, and wheelchairs);
- utilities management (relating to the various systems in place, for example electrical, heating, nurse call system, and general communications);
- emergency preparedness;
- hazardous materials including biohazards;

· the administration of the safety program itself, including such things as the maintenance of committee minutes and compliance with OSHA ("Occupational Health and Safety Administration") regulations; and

· security management (including such things as surveillance of the facility indoors and out to keep out intruders, and key and building access control procedures).

13. During the last years of his tenure at KNCC, Mr. Warne became concerned with several ongoing safety-related practices of KNCC, including but not limited to:

· the haphazard attitude of KNCC upper management towards the state-mandated requirement that department heads receive training regarding certain fire and other safety issues, including infection control; in particular, department heads were routinely authorized by Executive Director Mahler to sign up for, and take credit for, 8-hour in-service training sessions which did not take place, a practice that caused the safety awareness of department heads to erode over time;

· root causes of defunct fire drills were stricken from reports by Executive Director Mahler, who then signed the inaccurate reports;

· the KNCC administration would not support Mr. Warne's efforts to develop specific targeted procedures for individual departments relating to the issue of fire evacuation, thereby leading to more generalized (and hence less effective) procedures; moreover, Ms. Mahler failed to recognize and support numerous aspects of fire code enforcement in the KNCC facility that were shirked or resisted by other department heads (all of which shortcomings were occurring in the context of two relatively contemporaneous laundry fires and a sharp increase in local Fire Department dispatches for near-miss fire/smoke events);

- Mr. Warne was denied access to the reports resulting from the investigation of patient falls, hindering his role as the KNCC employee with substantial responsibility for preventing such falls;

- KNCC failed to implement the safety practices ("Safe Lift/Transfer Program") suggested by its workers compensation insurance carrier, a company known as "PMA";

- an increased number of false fire alarms due to unsafe employee practices (e.g. unattended food in microwave; meltable fabrics in clothes dryers; etc.);

- the unwillingness of KNCC to accept his resignation from the safety committee, which had been offered many times (insofar as he felt that he was not being provided with adequate resources and support to properly implement appropriate safety practices);

- a failure on the part of Ms. Mahler to support state-required disaster emergency preparedness procedures, despite months of subcommittee planning and preparation, for a tornado event (indeed, she aborted a scheduled 90-minute exercise, planned so as to include mock casualties and triage and emergency procedures with a post-event critique, after only five minutes); and

- the unwillingness of Ms. Mahler to allow Mr. Warne to participate in the creation of an acceptable risk management program (relating primarily to patient falls and employee accidents and injuries), when in fact he was the logical person to create such a program based upon his expertise and knowledge of the institution (in particular, Mr. Warne believes that Ms. Mahler feared that he would institute a program that would reveal her ongoing unsafe practices, discussed further below).

14. As a general proposition, insofar as Mr. Warne's safety responsibilities required that he maintain an awareness of staff attentiveness to safety issues, it was neither uncommon nor

unauthorized for Mr. Warne to confront individual staff members in a professional manner with regard to their need to improve or correct their safety-related practices; this was within the ordinary course of his employment and had been, over a period of years, an accepted aspect of his management style in the area of safety.

15. In 2004 and 2005, federal and state mandated surveys of the practices of KNCC led to findings that actual harm had resulted to patients as a result of operational and/or plant deficiencies that were found at KNCC.

16. Mr. Warne was greatly troubled by the negative surveys, insofar as his warnings about safety problems associated with certain pending construction projects had been ignored, and prophylactic measures that were taken were in his opinion insufficient and a significant part of the cause for the problematic surveys.

17. On information and belief, KNCC's management consultant, Harbor Management, sought to have Mr. Warne terminated, in a blatant attempt to scapegoat him for the bad surveys.

18. While Eileen Mahler defended him from Harbor Management's attacks, based upon her understanding of his attentiveness to safety issues, Mr. Warne believes that Ms. Mahler had developed, by this time, a belief that, simply by assigning a thorough and capable and employee such as Mr. Warne to the safety function, she had thereby met her obligation to maintain a safe facility irregardless of her willingness to cooperate with Mr. Warne's efforts to insure a safe environment.

19. While the belief on the part of Ms. Mahler identified in the previous paragraph might have been valid had she been supportive of Mr. Warne's requests for action on safety issues, in fact it appears that, while supportive of his fitness for the position, she was consistently resistant to his requests for improvements and/or changes to safety practices, thereby creating fertile soil for the

tensions that developed in 2005 around issues of safety at KNCC, tensions that ultimately led to Mr. Warne's termination.

*Events leading up to Mr. Warne's termination*

20. In May of 2005, Ms. Ellen Mangrelli became the new Director of Nursing at KNCC.

21. Ms. Mangrelli was, from the outset, extremely resistant to Mr. Warne's efforts to improve the security practices of nurses under her charge, a resistance that frustrated Mr. Warne's efforts to satisfy his responsibility to maintain a safe facility.

22. Mr. Warne had worked with approximately eight Directors of Nursing at KNCC prior to working with Ms. Mangrelli; in the case of each of these prior Directors of Nursing, it was always the practice that, in the event of a patient fall, the Director of Nursing and Mr. Warne would work together in a routine process of "fall analysis" in which an effort was made to identify the factors contributing to or causing the fall.

23. Ms. Mangrelli squelched Mr. Warne's participation in fall analyses.

24. Statistics with regard to patient falls at KNCC improved during Ms. Mangrelli's tenure, which is believed by Mr. Warne to be the result not of improved conditions or procedures but rather flawed recordkeeping, which flawed recordkeeping was, on information and belief, an intentional practice by Ms. Mangrelli in conjunction with Ms. Mahler.

25. When Mr. Warne attempted to provide his point of view on patient falls at fall committee meetings, he was invariably accused of wrongfully involving himself in clinical details and/or interfering with nursing issues.

26. Two particular residents, Katherine (Kitty) Ryan and Katherine Wortz, sustained injuries as the result of recurrent falls in the third floor Alzheimer's unit, which Mr. Warne attempted to understand by viewing videotapes of nursing activities; although the videotapes seemed to indicate that certain nurses were literally sleeping on the job, Mr. Warne's efforts were criticized as interference in nursing business.

27. Mr. Warne also became aware that certain floor areas were rendered dangerous by a wet condition that resulted from mopping techniques and procedures, and he became aware that certain bed and wheelchair fall alarms were not being properly utilized by the staff.

28. Mr. Warne also became aware of certain irregularities involving the investigation and reporting of a fall sustained by patient Katherine Wortz, including the late preparation and submission of a report which, on information and belief, contained a sanitized version of events.

29. Mr. Warne's efforts to improve the safety practices surrounding the patient fall issue were consistently rebuffed during the tenure of Ms. Mangrelli.

30. At or about the same time, Executive Director Mahler began to draft a required "Riskanagement Program;" a task that Mr. Warne was more qualified to perform, as briefly referenced above; on information and belief, Mr. Warne believes that Ms. Mahler excluded him from the task because she feared that he would be too conscientious in his approach to risk management (including patient falls), thereby burdening KNCC.

31. On information and belief, the preparation of the Risk Management Program dragged on for many months in an incomplete status, primarily because Ms. Mahler was unable to draft it but unwilling to delegate it to Mr. Warne.

32. The combination of Ms. Mahler's reliance on Director of Nursing Mangrelli, Ms. Mangrelli's lack of cooperation with (and eroding relationship with) Mr. Warne, Mr. Warne's demonstrated

vigilance on safety issues, and Ms. Mahler's evident frustration at her inability to draft a functional risk management program without Mr. Warne's assistance, caused Ms. Mahler to begin to question Mr. Warne's practices.

33. This erosion in the relationship between Ms. Mahler and Mr. Warne proceeded slowly at first, and indeed Mr. Warne's performance review in November of 2005 (only four months before his termination) contained the following language from Ms. Mahler: "Ron is very detail oriented which results in efficient and thorough results. His performance is outstanding and Ron displays an excellent work ethic . . . Ron is extremely motivated and is quick to handle issues in a systematic and thorough manner . . . Ron can be depended on to fulfill all obligations as it relates to facility environment and safety issues. He is very generous with his time and always plans time off well in advance."

34. As Mr. Warne continued to challenge KNCC safety practices, however, and insofar as his mere presence served to emphasize for Ms. Mahler her inability to properly draft the risk management program, it became evident to Mr. Warne that he had become the target of a campaign to distort and/or magnify minor job-related situations for the purpose of creating a paper "record" that would appear to justify his termination, including:

- a purported incident involving Mr. Warne and KNCC employee Darnell Jackson, which did not involve Mr. Warne interfering in Mr. Jackson's job duties but merely involved instruction as to safety implications of a wet floor;
- a purported incident in which he allegedly "attacked the Staff Developer" at a meeting, when in fact he had merely noted the failure of KNCC to properly schedule certain training and education sessions (a legitimate and troubling issue) without mentioning the Staff Developer by name; and

· a minor incident over a thermostat setting that was frustrating not because of Mr. Warne's involvement, but rather because of the difficulty in isolating the problem and regulating temperature in the relevant area; this incident was magnified despite Mr. Warne's efforts to resolve it with Ms. Jean Gayle (who was Ms. Mahler's secretary, and who may have magnified the incident at the behest of Ms. Mahler).

35. The distortion and/or magnification of these minor events was particularly disturbing to Mr. Warne in that he had *never*, during his eleven plus years on the job, ever received a single written warning or other written corrective action of any kind, but rather had a spotless personnel file.

*The Risk Management Committee meeting of February 17, 2006, and Mr. Warne's subsequent termination*

36. Matters on the failure to development a risk management program came to a head at the committee meeting of February 17, 2006.

37. At that meeting, Mr. Warne objected to the so-called "report forms" method of reporting by department heads as a substitute for detailed minutes, arguing that such "report forms" would not accurately reflect the number and nature of patient falls; he indicated the importance of analysis of all actual falls for the purpose of preventing future falls.

38. Mr. Warne acted at all times professionally during this meeting, although he did state that he "respectfully disagree[d]" with numerous of Ms. Mahler's actual and/or proposed courses of action, such as the evaporation of the Staff/Education Development program and the deterioration of Fire Safety and Emergency Preparedness programs

39. Mr. Warne's complaints about fall procedures and other matters followed on the heels of his longstanding objection to being excluded from access to the official reports of falls that went to

the State of Delaware, which he has long suspected were kept from him precisely because he had the motivation and tenacity to dig for the real reasons behind the falls.

40. On information and belief, Ms. Mahler and/or other department heads did not want Mr. Warne to review what may have been inappropriate or inaccurate reporting in the fall forms.

41. At the conclusion of this meeting, apparently annoyed at Mr. Warne's insistence on proper practices, Ms. Mahler told Mr. Warne's wife, Laura Hummel, who was also then employed by KNCC, "I know what I'm going to do."

42. In Mr. Warne's interim performance review dated February 24, 2006, he is identified as being inflexible in his approach to the Risk Management program, when in fact he was excluded from the development process; in effect, the interim evaluation scapegoats him for Eileen Mahler's failure to develop a finished and workable program, as had been tasked by the KNCC board in response to growing board concerns about falls and other safety shortcomings at the facility.

43. On information and belief, Ms. Mahler was affronted by Mr. Warne's actions in challenging her management at the February 17, 2006 meeting, sought to continue to hide her wrongful practices, and proceeded, within a month, to terminate Mr. Warne.

## COUNT I
### Violation of the discrimination and retaliation provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.

44.    Paragraphs 1 to 43 are restated as if more fully set forth herein.

45. The actions of defendant KNCC in harassing and terminating Mr. Warne were motivated by unlawful age discrimination and retaliatory motive, in violation of the federal Age Discrimination in Employment Act.

46. Mr. Warne has suffered damages as a result of the actions of defendant KNCC, including lost salary and benefits, damage to his career and reputation, loss of future earning capacity, great mental anguish and embarrassment, and other losses.

## COUNT II
**Violation of the retaliation and discrimination provisions of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

47. Paragraphs 1 to 18 are restated as if more fully set forth herein.

48. Managers and decisionmakers at defendant KNCC, and in particular Eileen Mahler, regarded Mr. Warne as psychologically disabled.

49. The actions of defendant KNCC in harassing and terminating Mr. Warne were motivated by unlawful disability discrimination and retaliatory motive in that said defendant regarded him as a disabled person when in fact he was not, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

50. Mr. Warne has suffered damages as a result of the actions of defendant KNCC, including lost salary and benefits, damage to his career and reputation, loss of future earning capacity, great mental anguish and embarrassment, and other losses.

## COUNT III
**Violation of the gender bias and retaliation provisions of Title VII, 42 U.S.C. § 2000e-1 et seq.**

51. Paragraphs 1 to 50 are restated as if more fully set forth herein.

52. The action of defendant KNCC in terminating Mr. Warne was motivated by unlawful gender discrimination and further was in retaliation for having raised his rights under Title VII, in violation of 42 U.S.C. § 2000e-1 et seq.

53. Mr. Warne has suffered damages as a result of the actions of defendant KNCC, including lost salary and benefits, damage to his career and reputation, great mental anguish and embarrassment, and other losses.

## COUNT IV
## Violation of Delaware Age, Gender, and Disabilities Discrimination statute, 19 Del. C. § 711 et seq.

54. Paragraphs 1-53 are restated as if more fully set forth herein.

55. The actions of defendant KNCC in harassing and terminating Mr. Warne were motivated by unlawful age, gender, and disability discrimination and retaliatory motive, in violation of the State of Delaware statutory protections against age and disability discrimination in employment, 19 Del. C. § 711 et seq.

56. Mr. Warne has suffered damages as a result of the actions of defendant KNCC, including lost salary and benefits, damage to his career and reputation, loss of future earning capacity, great mental anguish and embarrassment, and other losses.

## COUNT V
## Violation of Delaware Whistleblowers Protection Act, 19 Del. C. § 1701 et seq.

57. Paragraphs 1 to 56 are hereby restated as if fully set forth.

58. Mr. Warne has been terminated in violation of 19 Del. C. § 1703 in that he has been discriminated against and discharged because he has reported violations of safety practices at KNCC that constitute serious deviations from accepted and required practices, and had raised questions about certain of KNCC's Medicare/Medicaid practices.

59. Mr. Warne has suffered significant damages as a result of the aforesaid discrimination and discharge, including loss of salary, damage to his career and reputation, significant mental anguish and embarrassment, and other losses.

## COUNT VI
## Violation of the Covenant of Good Faith and Fair Dealing

60. Paragraphs 1 to 59 are restated as if fully set forth.

61. Defendant KNCC has falsified the reasons for Mr. Warne's termination, referencing and inflating the purported importance of certain minor episodes (which episodes, in some cases, did not even constitute wrongful behavior), when in fact the real reason for his termination was the extent to which Mr. Warne has emphasized safety regulations in the KNCC facility.

62. Mr. Warne has suffered damages as a result of the actions of KNCC, including lost salary, damage to his career and reputation, great mental anguish and embarrassment, and other losses.

WHEREFORE, plaintiff Ronald C. Warne demands that judgment be entered in his favor against defendant on the above claims, including an award of compensatory damages, punitive damages,

costs of suit, interest, attorneys' fees under any and all applicable statutes, and any other appropriate or relevant statutory or common law basis, and such other and further relief as this Court may deem appropriate.

DATE: December 19, 2007                    Plaintiff, RONALD C. WARNE

                                           By his attorney:

                                           _____
                                           Herbert G. Feuerhake, Esq.
                                           The Law Office of Herbert G. Feuerhake
                                           521 West Street
                                           Wilmington, Delaware 19801
                                           (302) 658-6101
                                           Atty. ID No. 2590

# Exhibit A

EEOC Form 161 (3/98)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: Ronald Warne
129 Emerald Ridge Drive
Bear, DE 19701

From: Philadelphia District Office
801 Market Street
Suite 1300
Philadelphia, PA 19107

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2007-01427 | Legal Unit | (215) 440-2828 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosure(s)     _[signature]_     October 4, 2007
Marie M. Tomasso,
District Director     (Date Mailed)

cc: Herbert G. Feuerkake, Esq., Attorney for Charging Party
David H. Williams, Esq., Attorney for Respondent
(Kentmere Nursing Care Center)